IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SABRINA LAMB and CASH CAMP INC. d/b/a WORLD OF MONEY,<br><br>Plaintiffs,<br><br>v.<br><br>YWCA METROPOLITAN CHICAGO,<br><br>Defendant. | Case No. 23-cv-02821<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Sabrina Lamb and Cash Camp, d/b/a ("doing business as") World of Money ("WOM"), bring this suit against Defendant YWCA for alleged breach of contract and promissory estoppel under Illinois common law, and race discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981. Before the Court is Defendant's motion to dismiss Plaintiffs' Counts I (breach of contract) and II (promissory estoppel) [10] for failure to state a claim under F. R. Civ. P. 12(b)(6), lack of standing under F. R. Civ. P. 12(b)(1), and for violating the rule against shotgun pleading under F. R. Civ. P. 10(b). For the reasons stated herein, Defendant's motion to dismiss [10] is denied. Defendant shall answer the complaint by March 15, 2024.

I.   **Background**

The following factual allegations are taken from the First Amended Complaint ("FAC") [5] and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

1

Plaintiff Lamb founded Plaintiff WOM in 2005 with the mission of empowering children of color through financial education. [1] ¶ 7. WOM was highly successful under Lamb's leadership, becoming a leader in providing youth with immersive and holistic financial and entrepreneurial education with a global impact. *Id*. ¶ 8. Under Lamb's leadership, the organization was selected as a Promise Place by America's Promise Alliance and by AOL Impact as one of ten top social organizations in America. *Id*.

In 2019, Lamb met Dorri McWhorter, who served as the YWCA's CEO from 2013 to 2021. *Id*. ¶ 9. McWhorter was impressed by WOM and began courting Plaintiffs Lamb and WOM to join YWCA's umbrella of programs and services. *Id*. Plaintiffs considered joining YWCA based on McWhorter's promises to support WOM's activities in and around New York State and to leverage the YWCA's own substantial financial resources to help WOM expand its offerings nationally. *Id*. While negotiations for the YWCA's acquisition of WOM were being finalized, the YWCA offered Lamb a permanent position as the Executive Director ("ED") of WOM, which she accepted. *Id*. ¶ 10. Her salary was $150,000, beginning on July 6, 2020. *Id*.

On August 31, 2020, the YWCA entered into an agreement to acquire the rights to and assets of WOM and include it as a "program offering within the suite of services offered by YWCA", with the stipulation that Lamb would continue to serve as the ED. (Asset Acquisition Agreement ("Agreement")) [1-2]. *Id*. ¶ 11. At no time were Plaintiffs advised that WOM would have to financially support itself under the YWCA's umbrella; to the contrary, YWCA explicitly warranted in the Agreement that

2

it had "adequate capital to carry on [WOM's] Mission Program." *Id*. ¶ 12. However, despite YWCA's promises to "expand both [WOM's] impact and geographic reach", YWCA did not provide WOM with funding opportunities and support. *Id*. ¶¶ 12-13. After the acquisition, Lamb began reporting to Shelley Bromberek-Lamber, then the Chief Reimagination Officer, who frequently bullied and chastised Lamb, making comments such as "World of Money is living off of the YWCA's dime." *Id*. ¶ 13.

As time went on, YWCA's Development Department—tasked with fundraising for YWCA and its programs—ignored Plaintiffs, refused to help raise any money on WOM's behalf and shared only two funding opportunities over the two-and-a-half years that WOM was affiliated with the YWCA. *Id*. ¶ 15. The YWCA also reneged on its promise to leverage its donor base and contacts to support Plaintiffs' efforts to obtain funding in Illinois and the Midwest, leaving Plaintiffs with no connections or knowledge in a new city and region. *Id*. The Development Department further refused to provide Plaintiffs with access to a grant search database that could have helped Plaintiffs identify their own funding. *Id*.

To the contrary, Lamb presented numerous funding opportunities to the YWCA through her own connections—including three separate grants for millions of dollars in federal funding—that Defendant's General Counsel Robert Johnson and head of the Development Department, Molly Silverman, failed to pursue. *Id*. ¶ 16. When Lamb wanted to apply for unrestricted sponsorships, she was either told "don't apply separately", or that the sponsorship she had introduced would be shared with other programs. *Id*. The only support Plaintiffs received were consulting services

3

provided to all program directors. *Id.* ¶ 17. Plaintiffs did not receive personalized or targeted assistance, and Plaintiffs found the generalized consulting to be ineffectual. *Id.*

The YWCA further excluded WOM from other large grants, including $9 million from the McKenzie Scott Foundation, and diverted $64,000 in funding from MasterCard that was earmarked for WOM's student teachers to pay unrelated administrative expenses. *Id.* ¶ 18. The YWCA also interfered with Plaintiffs' ability to do their own fundraising by at first denying, and then extensively delaying, permission to use WOM's EIN to access New York local funding, as was required by funders. *Id.* ¶ 19. When Lamb expressed concern to YWCA leadership that her efforts to raise funds in New York were obstructed, she was told "Well you're going to have to get the money from somewhere else." *Id.*

For seven months, Lamb appealed to General Counsel Robert Johnson, her supervisor as of 2021, and Kevin Kelley, the YWCA's Director of Legal Affairs and Risk Management, to register in New Jersey to qualify WOM for a lucrative school district contract. *Id.* ¶ 20. Her requests were ignored and dismissed. *Id.* Eventually, WOM lost this contract opportunity. *Id.*

On December 14, 2022, two days before 321 attendees, children, parents and community leaders were confirmed to attend WOM's youth business pitch competition in New York City, Lamb was advised by the YWCA's executive team, influenced by Ms. Bromberek-Lambert, that the YWCA had decided to "unwind" the August 31, 2020, Agreement in order to divest itself of all its interests in WOM. *Id.* ¶

4

23. YWCA told Lamb that it was because WOM had "more expenses than revenues". *Id.* ¶ 24. Neither Lamb nor WOM's former board members or community leaders had been informed that revenue requirements were a requirement of the acquisition. *Id.* Although WOM's financial condition may have deteriorated, it was due to the YWCA's failure to provide the promised resources and funding to the program. *Id.*

That same day, Lamb was also notified that WOM was being "returned" to her via Cash Camp and that her employment with the YWCA was being terminated effective January 13, 2023, before the "unwinding" agreement had been approved. *Id.* ¶ 25. Two days before the termination date, Ms. Bromberek-Lambert cancelled Lamb's corporate credit card, which she had used to pay WOM's vendor bills. Lamb was thus responsible for 22 open vendor accounts with unpaid balances. *Id.*

The YWCA abandoned WOM's entire program, failing to live up to its promise to provide WOM with the necessary support to thrive. *Id.* ¶ 26. Due to the YWCA's unwinding of WOM on such short notice with no transitional plan or funding, Plaintiffs have struggled to fill contractual agreements to provide services and pay individuals and organizations that have provided WOM services. *Id.* ¶ 27. Plaintiffs' ability to fundraise has further been frustrated by the YWCA's failure to file tax form 990 for the past two years, leaving WOM without the 2-year track record typically required by donors. *Id.* WOM's Board of Directors have also been dissolved and cannot be easily reassembled, further damaging WOM's reputation and growth opportunities. *Id.*

Due to WOM's insufficient funding, Plaintiffs were forced to cancel WOM's annual youth financial education training institute which had been scheduled for July 2023. *Id*. ¶ 28. The event's cancellation has caused embarrassment and reputational damage to Lamb who must notify all the planned participants. *Id*. As an overall result of YWCA's inaction, WOM lost fundraising and programming momentum and has been left with fewer reserves and reputational damage. *Id*. ¶ 22.

Finally, while ED of WOM under the YWCA's umbrella, Lamb was also treated differently than her non-African-American counterparts. *Id*. ¶ 21. In contrast to Lamb, a White director counterpart of a recently acquired organization, Streetwise, had been given numerous fundraising opportunities and financial and institutional support that Plaintiffs never received. *Id*. Streetwise is still affiliated with the YWCA. *Id*. Lamb's experience was not unique, but rather consistent with a pattern of racial discrimination experienced by other senior African-American employees who have reported to Ms. Bromberek-Lambert in the last several years. *Id*. ¶ 14. The majority of Ms. Bromberek-Lambert's African-American subordinates have either been terminated or forced to resign despite strong performance due to Ms. Bromberek-Lambert's failure to support them. *Id*.

Plaintiffs seek compensatory damages for all operational expenses, back pay, front pay, benefits, pre-judgment interest for breach of contract and promissory estoppel (Count I and II),[1] and compensatory and punitive damages to Plaintiff Lamb for racial discrimination in violation of 42 U.S.C. §1981 (Count III). Before the Court

---

[1] In Plaintiffs' response, Plaintiff WOM agrees to withdraw Count II, promissory estoppel, against the YWCA. Plaintiff Lamb proceeds on Count II. [16] at 10.

is Defendant's motion to dismiss Counts I and II for failing to state a claim under F. R. Civ. P. 12(b)(6), for lack of standing under F. R. Civ. P. 12(b)(1), and for violating the rule against shotgun pleadings under F. R. Civ. P. 10(b). *See* [10]; [11].

**II. Standard**

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the

plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

Federal Rule of Civil Procedure 12(b)(1) "provides for dismissal of a claim based on lack of subject matter jurisdiction, including lack of standing." *Stubenfield v. Chicago Housing Authority*, 6 F. Supp. 3d 779, 782 (N.D. Ill. 2013) (citing *Retired Chicago Police Ass'n. v. City of Chicago*, 76 F.3d 856 (7th Cir. 1996)). On a facial 12(b)(1) challenge the Court should accept all material allegations of the complaint as true. *See Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) ("when evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly-Iqbal's* 'plausibility' requirement.").

**III. Analysis**

    **A. Breach of Contract**

To state a claim for breach of contract under Illinois law,[2] a party must allege "(i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) a resultant injury". *Batson v. Oak Tree, Ltd.*, 2013 IL App (1st) 123071 ¶ 35, 37 Ill. Dec. 489, 2 N.E.3d 1178, 1186.

The YWCA argues that Plaintiffs have failed to state a claim for breach of contract because the FAC does not allege a cognizable breach of the Agreement. [11] at 5. Defendants argue that (1) no breached provision of the Agreement has been

---

[2] The parties agree Illinois law controls the Agreement.

identified, and (2) any purported breach is improperly based on indefinite and uncertain language which was not a material term to the Agreement. *Id*. at 6. The parties dispute the meaning of the YWCA's obligation to "expand the impact and geographic reach of [WOM]", and the period in which the YWCA explicitly warranted in the Agreement that it had the "adequate capital to carry on the Mission Program". The Court addresses each argument in turn.

1. *Contract Duration*

Defendant alleges Section 5.2 of the Agreement limits its obligation to a specific timeframe, namely to immediately after the deal was closed. *Id*. Section 5.2 provides "[i]mmediately after giving effect to the transactions contemplated hereby, YWCA shall be solvent and shall: … (c) have adequate capital to carry on the Mission Program." [5-2] § 5.2. Defendant states at most, this section governs YWCA's representation that it had the ability to operate WOM *at the time* of the agreement, in August 2020. *Id*. at 5-6. It therefore did not breach its obligation, because it had the funds and did operate WOM immediately after the agreement was entered. In short, it argues that its obligation to have adequate capital to carry on WOM's mission program only existed in the limited timeframe after the agreement was executed, therefore there can be no breach. *Id*.

Plaintiffs argue this is nonsensical. [16] at 5. The Court agrees. The Agreement states that Defendants are acquiring WOM for the specific purpose of "carry[ing] on [WOM]'s mission". The Agreement is one of Asset Acquisition; according to the Agreement, WOM conveyed, assigned, transferred, and delivered to the YWCA all

9

tangible personal property, mission program materials, assigned contracts, liabilities, expenses, books and records, and any and all intellectual property rights as of the contract date. [5-2] at 3-4 (Article 2, Assets to be transferred and consideration). Though the Agreement doesn't define the exact length of time the YWCA intended to carry on WOM's mission, it is nonsensical for the Agreement to only exist "immediately after" the deal closes. Indeed, the contract does not specify a termination date, indicating it is a contract of indefinite duration (until a party terminates it), not a contract only in effect "immediately after" the deal is done. *See Jespersen v. Minn. Mining & Mfg.*, 183 Ill.2d 290, 233 Ill.Dec. 306, 700 N.E.2d 1014, 1017 (1988) ("Where parties have failed to agree on a contract's duration, the contract is construed as terminable at the will of either party…").

Further, even if the Court agreed that Defendant only had an obligation immediately after the contract was established, the Court would not be able to dismiss the claim because the contract is not clear. *Quaker Construction, Inc., v. American Airlines, Inc.*, 141 Ill. 2d 281, 288089 (1990) ("If the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a . . . . court cannot properly determine on a motion to dismiss."); *see also Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1104 (7th Cir. 1997) (reasoning *unambiguous* contracts are susceptible to dismissal for failure to state a claim under a breach of contract theory); *Thaw v. Bd. Of Libr. Trustees of Town of Cicero*, 998 F.2d 1016, at *3 (7th Cir. 1993) (noting the document at issue

was clear and unambiguous "and therefore the interpretation of its provisions was properly before the district court").

In sum, the Court rejects Defendant's argument that it was only obligated to have adequate capital to carry on WOM's mission immediately after August 20, 2020.

2. *Enforceability of the contract terms*

Defendants next argue the alleged breach, a failure to provide the support necessary to expand the impact and geographic reach of WOM, is far too indefinite and uncertain to be enforceable against the YWCA. Further, the alleged breach does not relate to a material term of the contract. [11] at 6-7.

For a contract to be enforceable, the material terms must be definite and certain. *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 67, 377 Ill.Dec.604, 34 N.E.3d 1132. "The terms of a contract will be found to be definite and certain if a court is able to ascertain what the parties agreed to, using proper rules of construction and principles of equity." *Id.* (internal citations omitted).

Defendant cites *Szafranski* for the proposition that its promise was too indefinite and uncertain. [11] at 6-7. But *Szafranski* is distinguishable because the contract in that case was an oral one. Defendant next relies on *Babbitt Municipalities, Inc. v. Health Care Service Corp.*, 2016 IL App (1st) 152662. But *Babbitt* is also unavailing. There, the plaintiff alleged that the defendant had a duty, pursuant to its originating documents, to act as a not-for-profit company for the mutual benefit of its policy holders. *Id.* ¶ 1. To resolve the dispute, the court looked to the defendant's articles and bylaws, and found they did not impose a "specific, legally enforceable

11

duty", but rather broadly worded statements of purpose. *Id.* ¶ 29. Here, in contrast, the YWCA specifically agreed to support and grow WOM's reach. Though this is a close call, accepting Plaintiffs' allegations as true, as the Court must at this stage, Plaintiffs have alleged sufficient facts such that the YWCA's abandoning WOM and leaving it in a damaged state, rather than supporting and growing it, as promised, supports a breach of contract claim.

Defendant next argues that the only material provisions of the contract are Sections 2.0-2.7. [11] at 7. But the cases cited do not support that contention.[3] Further, the sections Defendant cites as material compromise only a small portion of the 15-page agreement and are not designated as material, nor do Defendants give any reason as to why the other portions of the Agreement are immaterial.

Plaintiffs may proceed with Count I.

**B. Promissory Estoppel**

The Court next turns to Plaintiff Lamb's promissory estoppel claim. To state a claim for promissory estoppel, a plaintiff must allege facts that "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendant, and (4) plaintiff relied on the promise to its detriment." *Quake Construction*, 141 Ill. 2d at 309-310. The doctrine is a remedy in equity, where a contract may be implied, but none exists because of lack of consideration. *Dumas v. Infinity Broad Corp.*, 416 F.3d 671, 677 (7th Cir. 2005). Here, Defendant's argue that *Plaintiffs* (i.e., both Lamb and WOM), have conceded

---

[3] *Burton v. Airborne Express, Inc.*, 367 Ill.App.3d 1026 (5th Dist. 2006); *Metrick v. Chatz*, 266 Ill.App.3d 649 (1st Dist. 1994).

12

an enforceable contract governing the relationship between the parties exists. [11] at 8-10 (emphasis added). Therefore, neither Plaintiff could have a claim in promissory estoppel.[4] Further, the contract contains an integration clause, which would supersede all prior contracts, oral and written. *Id.* at 9. Defendant further argues Lamb's promissory estoppel claim fails because the purported promises are too ambiguous to be relied upon and violate the statute of frauds. *Id.* at 10. And finally, Defendant argues that Lamb's promissory estoppel claim fails because she was an at will employee. *Id.* at 13-14.

At top, the Court notes that some of Defendant's arguments are confounding. If a contract exists between Lamb and Defendant, as Defendant seemingly concedes in some portions of the argument (i.e., "Plaintiffs fail to state a claim… because there is a contract in existence"; discussion of the integration clause, which only exists when interpreting a contract), then Lamb would not need to bring this claim. In the absence of a contract, found by either judicial determination or by the parties' admission, Lamb can plead promissory estoppel in the alternative. *See e.g. Disco Intern., Inc. v. R.G. Ray Corp.*, 2010 WL 4705178, at *5 (N.D. Ill. 2005) ("[A] plaintiff may plead breach of contract and promissory estoppel in the alternative while the existence of a contract is in dispute.").

---

[4] Plaintiff WOM has dropped this claim against Defendant, but Plaintiff Lamb has pled this claim in the alternative, because a contract has not yet been found. Indeed, Defendant argues that Lamb lacks standing to bring a claim because she is not a named party to the agreement, was not a signatory to the agreement, and she is not in privity. The Court addresses that argument below.

The Court next turns to Defendant's argument that the purported promises are ambiguous and violate the statute of frauds. The Court notes this is a closer call, as promissory estoppel requires *unambiguous* promises. But the cases cited by Defendant, *Nibeel v. McDonald's Corp.*, 1998 WL 547286 (N.D. Ill 1998), and *Green v. Sutton Ford., Inc.*, 2022 WL 17668725 (N.D. Ill. Dec. 14, 2022), were decided on summary judgment. Defendants also cite *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 371 (1st Dist. 2006) for the proposition that Lamb's promissory estoppel claim is a clear attempt to sidestep Illinois' presumption of at will employment. [11] at 13-14. But Lamb notes she does not rely on the promise that her employment would be continued *ad infinitum*. Rather, she relied on the promise that Defendant would support WOM's activities in and around New York State and leverage its own financial resources to help WOM expand nationally. [16] at 12. Defendant's argument that Lamb is attempting a second bite at the apple misconstrues the caselaw. When a plaintiff fails to prove a contract existed, promissory estoppel is unavailable in an attempt to revive her case. *See Dumas*, 416 F.3d at 677 ("promissory estoppel is not a doctrine designed to give a party… a second bite at the apple *in the event it fails to prove* a breach of contract.") (emphasis added) (citing *All-Tech Telecom, Inc., v. Amway Corp.*, 174 F.3d 862, 869-70 (7th Cir. 1999). Here, Plaintiff is pleading promissory estoppel *in the alternative* that a contract isn't found. Unlike *All-Tech Telecom Inc.,* she is not pleading promissory estoppel or arguing reliance *after* failing to prove a breach of contract claim. Lamb's promissory estoppel can go forward in the alternative.

14

**C. Standing**

Defendant argues that Lamb does not have standing to bring a breach of contract claim because she is not a party to the contract, she is not in privity with a party, and she is not an intended third-party beneficiary. The Court is not persuaded on all three accounts.

A plaintiff may enforce a contract she is not a party to when she is in privity with one of those parties or is an intended third-party beneficiary of the contract. *Northbound Group, Inc., v. Norvax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015) (internal citation omitted). First, there is a dispute as to whether Lamb is a party to the contract, conceded as much in Defendant's own arguments discussed *supra*. Second, Lamb founded and operated WOM exclusively before Defendant's acquisition, continued to operate it under the YWCA's umbrella, and alleges she continued to do so when Defendant ceased to operate it and expressed its intent to return the organization to her exclusive control. Importantly, Lamb has alleged that she is responsible for paying WOM's bills since 2023, when the YWCA cancelled her company credit card. [5] ¶ 25. She also alleges that she is running WOM's programming, evidenced by having to cancel WOM's planned July 2023 event. *Id.* ¶ 28. Third, Plaintiff is an intended third-party beneficiary of the Agreement. A person receives a third-party beneficiary status when the contracting parties intended to confer a specific benefit upon that nonparty. *See e.g., Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 334 (7th Cir. 1999). Here, the YWCA intended to hire Lamb to continue to run WOM and paid her to do so. *See XL Disposal Corp., v. John Sexton Contractors*

*Co.*, 168 Ill.2d 355, 361 (1995) (finding that an attorney who was not a named party to a contract was an intended third-party beneficiary because the contract specified he would receive payments). Although her start date happened before the Acquisition Agreement was finalized, Lamb alleged that negotiations for WOM to join the YWCA were ongoing, indicating the deal closed because she would continue to run the organization. *Id.* ¶ 10.

The cases Defendant cites do not afford an opposite conclusion. In *Quinn* and *155 Harbor Drive Condominium Ass'n v. Harbor Point Inc.*, 209 Ill.App.3d 631, 647 (1st Dist. 1991), the plaintiffs were not intended third party beneficiaries, unlike here. In *Linda Const. Inc. v. Allied Waste Indus.*, 2017 WL 1196889, at *10 (N.D. Ill. 2017), the court found the plaintiff was seeking to enforce a right it did not have. ("Section 5.1's careful language giving LCS the specific third-party beneficiary rights to complain of underutilization suggests that LCS's rights… are limited to just that claim… not the general right to enforce all of the … [c]ontract."). Here, there was no careful language in the Agreement attempting to narrow the claims Lamb could bring, indicating she could enforce the contract generally.

Plaintiff Lamb may pursue her claim for breach of contract.

**D. Shotgun Pleadings**

Defendant argues Plaintiffs have violated Fed. R. Civ. P. 10(b), arguing Plaintiffs' pleading style has violated the rule against shotgun pleadings. Specifically, that the FAC has left it guessing as to what contractual obligations and promises are to each plaintiff. [11] at 14-15. The Court rejects this argument. Fed Civ. P. 8(d)(2)

16

allows a party to "set out 2 or more statements of a claim… alternatively… in a single count or … in separate ones", and Rule 10(b) does not prevent this so long as each claim is not "founded on a separate transaction or occurrence". The facts as alleged in the FAC are all based in the same transaction or occurrence, and Plaintiffs have alleged promises and breaches underlying their claims, satisfying both Rule 8 and Rule 10.

### III. Conclusion

For the stated reasons, Defendant's motion to dismiss [10] is denied. Defendant shall answer the complaint by March 15, 2024.

E N T E R:

Dated: February 26, 2024

MARY M. ROWLAND
United States District Judge